IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**JARED GABRIELE, individually and on
behalf of all others similarly situated**                                            **PLAINTIFF**

**V.**                              **CASE NO. 5:14-CV-05183**

**CONAGRA FOODS, INC.**                                                                **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Currently before the Court are Defendant ConAgra Foods, Inc's ("ConAgra") Motion for Judgment on the Pleadings (Doc. 30) and brief in support (Doc. 30-1), Plaintiff Jared Gabriele's ("Gabriele") Response in Opposition (Doc. 42), and ConAgra's Reply (Doc. 54). Also before the Court are Gabriele's Memorandum Regarding the Safe Harbor Provision of the Arkansas Deceptive Trade Practices Act (Doc. 49) and ConAgra's Supplemental Memorandum in Support of its Motion for Judgment on the Pleadings (Doc. 50). For the reasons set forth herein, ConAgra's Motion for Judgment on the Pleadings (Doc. 30) is **GRANTED IN PART AND DENIED IN PART**.

### I.  BACKGROUND

Gabriele brings this putative class action on behalf of Arkansas consumers pursuant to the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.*, and other state law causes of action, regarding allegedly deceptive and misleading labels on Hunt's tomato products. The Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) as this is a class action in which the matter in controversy exceeds the sum

or value of $5,000,000, at least one member of the class of plaintiffs is a citizen of a different state than a defendant, and the class has more than 100 members.

The allegations in the Amended Complaint ("Complaint") stem from labeling used in marketing and advertising Hunt's tomato products, which describes those products as "100% Natural" and "free of artificial ingredients and preservatives." Gabriele alleges that ConAgra's labeling is deceptive because the products actually "contain artificial ingredients and are not '100% Natural.'" (Doc. 5, p. 2). Gabriele contends that ConAgra mislabeled its tomato products in order to charge a premium for the products. According to Gabriele, mislabeled products cannot be legally sold or possessed, and misbranded food has no economic value. He further contends that had he known that the misbranded tomato products were illegal to sell or possess, he would not have purchased them.

Gabriele alleges violations of the Arkansas, Food, Drug, and Cosmetic Act ("AFDCA"), Ark. Code Ann. § 20-56-201, *et. seq.*, which serves as the factual predicate for five causes of action: (1) deceptive trade practices in violation of the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. § 4-88-101, *et seq.*; (2) unjust enrichment; (3) breach of implied warranty of merchantability; (4) breach of express warranty; and (5) negligence.

ConAgra seeks to have the Complaint dismissed due to express preemption by the federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"); failure to allege facts sufficient to support his claims; and Gabriele's lack of standing to pursue claims for products he never purchased.

In response, Gabriele maintains that preemption is not proper since he seeks to enforce state law food-labeling requirements that are identical to those of the FDCA. He

contends that his other claims under Arkansas law are properly pled. Gabriele also argues that he has standing to seek recovery for products substantially similar to those he actually purchased.

## II.  LEGAL STANDARD

A motion for judgment on the pleadings made pursuant to Federal Rule of Civil Procedure 12(c) requires the Court to "accept as true all factual allegations set out in the complaint" and to "construe the complaint in the light most favorable to the plaintiff[s], drawing all inferences in [their] favor."  *Ashley Co., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (internal citation omitted). "Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law, the same standard used to address a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Id.* (internal citation omitted). "[W]ell-pleaded facts, not legal theories or conclusions, determine [the] adequacy of [t]he complaint." *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009) (internal citations omitted). The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* (citing *Drobnak v. Andersen Corp*., 561 F.3d 778, 783 (8th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))). When considering a motion for judgment on th pleadings, the Court ordinarily does not consider matters outside the pleadings. Fed. R. Civ. P. 12(d).

### III. DISCUSSION

### A. Whether Gabriele's Claims are Preempted by the FDCA

ConAgra first asserts that this action should be dismissed because Gabriele's Complaint is preempted by the FDCA as amended by the Nutrition Labeling and Education Act ("NLEA"). Pub. L. No. 101–535, 104 Stat. 2353 (1990). Gabriele counters that he is not suing under the FDCA but rather under Arkansas state law for claims arising under the AFDCA, which Gabriele contends is identical to the food labeling regulations of the Food and Drug Administration ("FDA"). In support of this contention, he points out that section 20-56-209(7) of the Arkansas Code provides that any food is misbranded if it falls short of standards prescribed by the FDCA.

The Supreme Court has long recognized that state laws that conflict with federal law are "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (internal citation omitted). That is, Congress has the power to preempt state laws. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152–53 (1982). Federal preemption occurs when: (1) Congress enacts a statute that explicitly preempts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field. *See generally In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.*, 621 F. 3d 781, 791-94 (8th Cir. 2010). Although in the instant case, ConAgra only argues that Gabriele's claims are expressly preempted, the Court will also address field preemption, as the lack of a formal definition of "natural" reveals that the FDA did not intend to occupy the field as to labels containing the term "100% Natural."

Preemption is express where Congress has "explicitly stated [its intent] in the statute's language . . . ." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (internal quotation marks omitted). Thus, "[t]he critical question in any pre-emption analysis is whether Congress intended that federal regulation supersede state law." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 369 (1986). Moreover, in the context of state laws dealing with matters traditionally within the historic police powers of the states, congressional intent to preempt such laws must be "clear and manifest." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). In the absence of explicit statutory language, state law is preempted where it regulates conduct in a field that Congress intended to occupy exclusively, *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), such that the scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (internal citation and quotations omitted).

The FDCA grants the FDA the responsibility to protect public health by ensuring that "foods are safe, wholesome, sanitary, and properly labeled." 21 U.S.C. § 393(b)(2). There is no private right of action under the FDCA. 21 U.S.C. § 337(a). In 1990 Congress passed the NLEA, amending the FDCA, to specifically address labeling requirements for certain food and beverage products. The NLEA, codified as part of the FDCA, provides for national uniform nutrition labeling, and expressly preempts state law that is inconsistent with its requirements. 21 U.S.C. § 343–1(a). A food is misbranded "[i]f it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless it bears labeling

5

stating that fact . . . ." 21 U.S.C. § 343(k). Thus, states may impose labeling requirements for artificial flavors, colors, or preservatives only if such requirements are identical to those imposed by the FDCA; any differences are preempted.

Gabriele alleges in his Complaint that Hunt's tomato products violate Ark. Code Ann. § 20-56-209 because they are improperly described as "100% Natural," and "free of artificial ingredients and preservatives." In particular, Gabriele contends the tomato products are mislabeled because the presence of citric acid and calcium chloride means that the tomato products contain "artificial and synthetic ingredients which have undergone substantial processing and which include various artificial chemical preservatives and coloring agents." (Doc. 5, p. 9). In response, ConAgra argues that FDA regulations specifically define calcium chloride and citric acid as "nonsynthetic" and permit its use in food bearing an organic label pursuant to 7 C.F.R. § 205.605. ConAgra further argues that the FDA has expressly approved the use of an "all natural" label claim for a food product containing citric acid, as evidenced by a letter sent to Alexia, a subsidiary of ConAgra, which provides that the FDA did not object to the use of the "all natural" label if citric acid was "naturally derived."[1] Although calcium chloride is listed as a nonsynthetic substance

---

[1] "Generally, the Court must ignore materials that are outside of the pleadings; however, district courts 'may take judicial notice of public records and may thus consider them on a motion to dismiss.'" *Stahl v. United States Dept. of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003). Matters of public record may include records and reports of administrative bodies. Accordingly, the Court will take notice of the parties' exhibits containing the warning letters from the FDA. However, the Court notes that warning letters are not final agency action. The FDA Regulatory Procedures Manual explains that a warning letter is "the agency's principal means of achieving prompt *voluntary* compliance with the Federal Food, Drug and Cosmetic Act." FDA Manual, § 4–1–1 (emphasis added). Although a warning letter "communicates the agency's position on a matter," it is only "informal and advisory" and "does not commit FDA to taking enforcement action." *Id.*

in 7 C.F.R. § 205.605, the statute provides that citric acid is only considered nonsynthetic if produced by "microbial fermentation of carbohydrate substances."

> Citric acid . . . is the compound 2-hydroxy-1,2,3-propanetricarboxylic acid. It is a naturally occurring constituent of plant and animal tissues . . . . [and] may be produced . . . from sources such as lemon or pineapple juice; by mycological fermentation using Candida spp., described in §§ 173.160 and 173.165 of this chapter; and by the solvent extraction process described in § 173.280 of this chapter for the recovery of citric acid from Aspergillus niger fermentation liquor.

21 C.F.R. § 184.1033. Although ConAgra provides an affidavit from a Northern District of California case (involving Hunt's tomato products) attesting to these ingredients being naturally derived, the Court may not look to documents outside of the Complaint at this stage in the litigation, without treating the motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d). The appropriate time to address these affidavits is on summary judgment. Gabriele's allegations—accepted as true—are that the products contain *artificially* derived citric acid or calcium chloride, in contravention of federal regulations. Thus, Gabriele's state law claims effectively parallel the FDCA, and are therefore not expressly preempted.

In arriving at this conclusion, the Court distinguishes its holding in *Craig v. Twinings*, 2015 WL 505867 (W.D. Ark. Feb. 5, 2015), where it dismissed similar false labeling claims based on express preemption. The label in Twinings advertised tea as a "natural source of antioxidants," which is expressly permitted by the FDCA because of a regulation that exempts tea from the nutrient-content requirements under 21 U.S.C. § 343(r). The Court further found that Twinings' tea labels did not violate the FDA's labeling requirements

because they did not characterize the level of antioxidants. Thus, all of the plaintiff's state-law claims were preempted because the plaintiff was seeking to impose liability in a manner that was expressly inconsistent with the FDCA. The instant case differs from *Twinings* because it has nothing to do with special labeling requirements applicable to tea, and there are no corollary regulations that would be similarly preemptive of the instant dispute.

The term "natural" is not defined in the FDCA, and the FDA has expressly declined to define "natural" in any regulation or formal policy statement. The FDA adopted an informal policy that "natural" means merely that "nothing artificial or synthetic (including colors regardless of source) is included in, or has been added to, the product that would not normally be expected to be there." 58 Fed. Reg. 2302–01 at *2407 (Jan. 6, 1993). In 1991, the FDA solicited comments on a potential rule adopting a definition for the term "natural," noting that the use of "natural" on food labels "is of considerable interest to consumers and industry." *See id.* However, the FDA concluded that while "the ambiguity surrounding the use of this term . . . could be abated" if the term were adequately defined, the FDA was unwilling at that time to consider defining "natural" because of "resource limitations and other agency priorities." *Id*.

The FDA had opportunities to define "natural" in 2002, when the Center for Science in the Public Interest asked the FDA to take action against Ben & Jerry's for labeling its products "all natural"; in 2006, when the Sugar Association petitioned the FDA to define "natural"; and again in 2010, when a number of United States district courts issued six-month stays of pending litigation over the use of "natural" in beverages containing

high-fructose corn syrup. *See Janney v. Mills*, 944 F.Supp.2d 806, 812 (N.D. Ca. May 10, 2013). Nevertheless, in each instance the FDA declined to become involved. *Id.*

With only an informal policy statement on which to rely for the definition for "natural," the FDA has taken little action against companies for improperly using the term, and instead appears to favor issuing warning letters. For example, the FDA issued warning letters to Oak Tree Farm Dairy on August 16, 2001; to Hirzel Canning Company on August 29, 2001; and to Alexia Foods on November 16, 2011, stating that although no established regulatory definition exists for the term "natural," the FDA discussed its use in the preamble to the food labeling final regulations. (Docs. 42-1, 42-2, and 42-3). The letters suggest the addition of calcium chloride and citric acid, among other ingredients, to these products preclude the use of the term "natural" to describe the product, in contrast to regulations that suggest that it could be otherwise. However, these letters are advisory and do not signal final agency action.

Thus, with respect to Gabriele's claims, and unlike the express regulations discussed in *Twinings*, there are no federal requirements regarding the term "natural" to be given preemptive effect.

### B. Actual Damages Under the ADTPA

ConAgra contends that Gabriele fails to assert a private cause of action under the ADTPA because he has alleged a claim for a mere diminution in value of the purchased product. Gabriele contends that ConAgra violated the ADTPA when it knowingly advertised and sold tomato products that were "mislabeled." Gabriele argues that he bargained for tomato products that were represented as "100% Natural" and "free of

artificial ingredients and preservatives," but that actually contained artificial preservatives. Gabriele claims he reasonably relied upon these representations, and consequently, incurred damages defined as the premium price paid for products he otherwise would not have purchased.

When a person "suffers actual damage or injury as a result of an offense or violation" of the ADTPA, Ark. Code Ann. § 4–88–113(f), a cause of action for liability may be brought for any "unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4–88–107(a)(10). The ADTPA prohibits a variety of listed practices, including "[k]nowingly making a false representation as to the . . . characteristics . . . of goods or services" and contains a catchall provision prohibiting "any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4–88–107(a)(1), (a)(10).

However, the ADTPA has a safe-harbor provision that prohibits a plaintiff from bringing a suit regarding:

> (3) Actions or transactions *permitted* under laws administered by the Insurance Commissioner, the Securities Commissioner, the State Highway Commission, the Bank Commissioner, or other regulatory body or officer acting under statutory authority of this state or the United States, unless a director of these divisions specifically requests the Attorney General to implement the powers of this chapter.

Ark. Code Ann. §4-88-101 (emphasis added).

Although not initially raised by ConAgra, the Court directed the parties to submit briefs as to whether the safe harbor provision exempts all regulated conduct, regardless

of whether substantive state law specifically authorizes the conduct.  Courts have applied two rules regarding the construction of safe-harbor provisions to state DTPAs: (1) the "specific-conduct" rule, which looks to whether state law permits or prohibits the conduct at issue and only exempts expressly permitted conduct from DTPA claims; and (2) the "general-activity" rule, which looks to whether a state agency regulates the conduct, in which case a regulated actor enjoys full exemption from the DTPA.[2]  *See e.g., Skinner v. Steele*, 730 S.W.2d 335, 338 (Tenn. Ct. App. 1987) (finding that the insurance industry is not exempt from the Tennessee Consumer Protection Act, as the sale of an insurance policy or annuity does not constitute an act or transaction that is "required or specifically authorized"); *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 55 (Colo. 2001), as modified on denial of reh'g (Jan. 11, 2002) (finding that Colorado's Unfair Claims—Deceptive Practices Act (UCDPA) does not preclude a private cause of action by an insured against an insurer under the CPA). *But see State v. Piedmont Funding Corp.*, 119 R.I. 695, 699 (1978) (concluding that the Legislature exempted all activities and businesses which are subject to monitoring by state or federal regulatory bodies or officers from the Deceptive Trade Practices Act); *Ferguson v. United Ins. Co. of Am.*, 163 Ga. App. 282, 282 (1982) (finding that insurance transactions are among those types of transactions which are exempt from the Fair Business Practices Act).

Both ConAgra and Gabriele point to the Arkansas Supreme Court case of *DePriest v. AstraZeneca Pharm., L.P.*, 2009 Ark. 547 (2009), for the premise that permitted conduct is exempted from the safe-harbor provision. In that case, the court applied the specific-

---

[2]Nathan Price Chaney, *The Arkansas Deceptive Trade Practices Act: The Arkansas Supreme Court Should Adopt the Specific Conduct Rule*, 67 ARK. L. REV. 299, 300 (2014).

conduct rule and upheld the trial court's dismissal of a class action that alleged that AstraZeneca violated the ADTPA by fraudulently marketing one of its drugs. *Id.* at *18. There, the FDA specifically approved the labeling for the drug, and therefore the court found that the safe-harbor exemption applied because AstraZeneca's actions were consistent with the FDA-approved labeling for the drug. *Id.* at 16-18. Thus, the Arkansas Supreme Court did not consider the general-activity rule.

Gabriele acknowledges a more recent Arkansas Supreme Court case where the general-activity rule was applied, although he contends the case should not be read in this manner. *See Arlow Designs, LLC v. Ark. Capital Corp.*, 2014 Ark. 21 (2014). The Arkansas Supreme Court upheld the dismissal of the plaintiff's claim under the ADTPA because the alleged deceptive conduct of the banks were subject to the control of regulatory agencies, such as the Arkansas State Board of Finance and the Office of the Comptroller of Currency and the Federal Deposit Insurance Commission. *Id.* at *6. The court found that because banks are "regulated by a regulatory body acting under statutory authority of Arkansas or of the United States, their actions and transactions are not subject to claims that can be brought under the ADTPA unless a specific request has been made to the Attorney General." *Id.* Consistent with the plain language of the ADTPA, it appears that the Arkansas Supreme Court recognizes and applies the so-called general-activity rule. In other words, the safe-harbor provision exempts regulated conduct by regulated actors regardless of whether substantive state law explicitly authorizes or prohibits the

precise conduct at issue.[3] Therefore, the ADTPA does not apply to conduct regulated by a state or federal agency, such as the Arkansas Board of Health and/or the FDA.

The Court finds that because the alleged mislabeling of products is conduct that is regulated by the FDA and the Arkansas Board of Health,[4] the safe-harbor provision applies, and there is no private right of action. Gabriele's ADTPA claim is therefore dismissed with prejudice.

### C. Unjust Enrichment

ConAgra argues that Gabriele's unjust enrichment claim should be dismissed because he does not allege that ConAgra received a direct benefit, or even had direct dealings with Gabriele. "[A]n action based on unjust enrichment is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain." *El Paso Prod. Co. v. Blanchard*, 371 Ark. 634, 646 (2007). To find unjust enrichment, a party must have received something of value, to which he or she is not entitled and which he or she must restore. *Id.* The amount

---

[3]*See also Williams v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 2573196, at *4 (E.D. Ark. June 22, 2010) (finding that the ADTPA does not apply to insurance activities regulated under the Insurance Commissioner, as this "would render the exceptions listed in section 4-88-101 meaningless and would doubtless run afoul of the statutory scheme created by the Arkansas General Assembly. . . . To hold that insurance carriers are subject to private causes of action brought pursuant to the ADTPA would be contrary to the statutory scheme established by the Arkansas General Assembly."); *King v. Homeward Residential, Inc.*, 2014 WL 6485665, at *1 (E.D. Ark. Nov. 18, 2014) (finding the ADTPA does not apply to actions or transactions permitted under laws administered by the Arkansas Insurance Commissioner or by any other officer or regulatory body acting under state or federal statutory authority).

[4]The Arkansas Board of Health regulates this conduct under the AFDCA at Ark. Code Ann. § 20-56-201 through § 20-64-1103. The FDA regulates this conduct under the FDCA at 21 U.S.C. § 301 through § 399(f).

of recovery is measured by the value of the benefit conferred upon the party unjustly enriched. *Sanders v. Bradley Cnty. Human Servs. Pub. Facilities Bd.*, 330 Ark. 675, 682 (1997). The issue of unjust enrichment is a question of fact. *Grisanti v. Zanone*, 2010 Ark. App. 545 at *6-7 (2009).

Gabriele's unjust enrichment claim was premised on the notion that ConAgra profited from the sale of mislabeled products. Gabriele has alleged sufficient facts at this stage in the litigation to survive dismissal, as there remain questions of fact as to whether a benefit was conferred on ConAgra due to its alleged misrepresentations and whether Gabriele is entitled to any recovery as a result.

### D. Breach of Implied Warranty of Merchantability

To recover for breach of implied warranty of merchantability, Gabriele must prove: (1) that he has sustained damages; (2) that the product sold to him was not merchantable, *i.e.*, fit for the ordinary purpose for which such goods are used; (3) that this unmerchantable condition was a proximate cause of his damages; and (4) that he was a person whom the defendant might reasonably expect to use or be affected by the product. *E.I. Du Pont de Nemours & Co. v. Dillaha*, 280 Ark. 477, 480 (1983). The warranty of merchantability generally promises that "the goods will conform to the ordinary standards and are of average grade, quality, and value of like goods which are generally sold in the stream of commerce." *Rynders v. E.I. Du Pont De Nemours & Co.*, 21 F.3d 835, 841 (8th Cir. 1994) (citing Alphonse M. Squillante & John R. Fonseca, *Williston on Sales* § 18–5 at 67–68 (4th ed. 1974 and 1993 supplement) and U.C.C. § 2-314 Comment 2 (1990) (goods "must be of a quality comparable to that generally acceptable in that line of trade")).

Gabriele argues that the products at issue violate the implied warranty of merchantability because the products are illegal, misbranded, and economically worthless. However, Gabriele has not alleged that the products lack even the most basic degree of fitness for ordinary use, such as the ability to be consumed. His implied warranty claim therefore fails, and it is dismissed without prejudice.

### E. Breach of Express Warranty

Gabriele alleges that ConAgra's product labels constitute express warranties that became part of the basis of his bargain with ConAgra, such that ConAgra's failure to deliver an "all natural" product constituted a breach of warranty. "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." *Ciba-Geigy Corp. v. Alter*, 309 Ark. 426, 447 (1992) (citing Ark. Code Ann. § 4-2-313(1)(a)).

ConAgra's statements that the tomato products are "100% Natural" and "free of artificial ingredients" are affirmative claims that Gabriele maintains are false. The Court finds that Gabriele has alleged sufficient facts to make out a claim for breach of express warranty.

### F. Negligence

ConAgra also argues that Gabriele failed to state a claim for negligence. Gabriele alleges that ConAgra failed to lawfully label its products and disclose material facts in direct violation of Arkansas statutes, thus constituting negligence *per se*. To establish a claim for negligence under Arkansas law, a plaintiff must demonstrate that: (1) a duty of care was

owed; (2) the defendant breached that duty of care; and (3) the breach was the proximate cause of the plaintiff's injuries. *Yanner Co., Ltd. v. Slater*, 2012 Ark. 36 (2012) (internal citations omitted). "To constitute negligence, an act must be one from which a reasonably careful person would foresee such an appreciable risk of harm to others as to cause him not to do the act, or to do it in a more careful manner." *Wallace v. Broyles*, 331 Ark. 58, 67 (1998) (citing AMI Civil 3rd 301).

Because it is unclear at this juncture whether the labels in question violate the labeling regulations prescribed by the AFDCA, Gabriele has sufficiently alleged that ConAgra breached a duty of care, which was a proximate cause of his alleged damaegs, and therefore his negligence claim survives the Motion for Judgment on the Pleadings.

### G. Whether Gabriele May Represent the Class for Products He Did Not Purchase

ConAgra contends that Gabriele lacks Article III standing to bring claims related to products he never purchased, consumed, or possessed. Gabriele counters that he has standing to assert claims for unnamed class members based on products he did not purchase so long as the products and alleged misrepresentations are substantially similar.

Those who seek to invoke the power of the federal courts "must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974). Article III requires "an injury [to] be concrete, particularized, and actual or imminent." *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014). In a class action, the plaintiff seeking to represent a class must establish that he, personally, has standing to bring the

cause of action. If the plaintiff cannot maintain the action on his own behalf, he may not seek such relief on behalf of the class. *O'Shea*, 414 U.S. at 494.

ConAgra does not allege that Gabriele lacks standing to pursue claims for products he did purchase. The relevant question thus becomes whether Gabriele can represent putative class members as to similar products that he did not purchase. ConAgra correctly notes that several federal courts have dismissed consumer protection claims in class action complaints based upon products the class representative did not purchase. *See, e.g., Garcia v. Kashi Co.*, 43 F.Supp.3d 1359, 1393 (S.D. Fla. Sept. 5, 2014) (holding a named plaintiff in a consumer class action lacked standing to raise claims related to products he did not purchase); *Toback v. GNC Holdings, Inc.*, 2013 WL 5206103, at *5 (S.D. Fla. Sept. 13, 2013) (same); *Pearson v. Target Corp.*, 2012 WL 7761986 (N.D. Ill. Nov. 9, 2012) (same). However, other federal courts have held that whether a class representative has standing to maintain a consumer class action relating to an entire product line, despite having only purchased a subset of those products, is a question more appropriate for resolution at the class-certification stage. *See, e.g., In re Frito–Lay N. Am., Inc.* 2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013): *Cardenas v. NBTY, Inc.*, 870 F.Supp.2d 984, 991–92 (E.D.Cal. May 4, 2012).

In a putative class action, "a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant, thus satisfying Article III standing requirements, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA–IBEW Health &*

*Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (internal quotations and citations omitted).

Because Gabriele has satisfied the Article III standing inquiry, his ability to represent putative class members who purchased products he has not purchased is reserved for the class-certification stage of these proceedings.

## IV. CONCLUSION

For the reasons set forth herein, **IT IS HEREBY ORDERED** that ConAgra Foods, Inc's Motion for Judgment on the Pleadings (Doc. 30) is **GRANTED IN PART AND DENIED IN PART**. The Motion is **DENIED** as to whether Plaintiff Jared Gabriele's claims are preempted by federal law and whether Gabriele has standing to bring claims related to products he did not purchase. The Motion is further **DENIED** with respect to Gabriele's claims of unjust enrichment, breach of express warranty, and negligence.

The Motion is **GRANTED** with respect to Gabriele's claims for breach of implied warranty of merchantability and for violations of the ADTPA. Gabriele's claim for breach of implied warranty of merchantability is **DISMISSED WITHOUT PREJUDICE**. Gabriele's claim for violation of the ADTPA is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** this 25th day of June, 2015.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE